Meredith A. Ahearn
HAGANS, AHEARN & WEBB
310 K Street, Suite 400
Anchorage, AK  99501
(907) 276-5294

Attorney for Defendant

UNITED STATES DISTRICT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>RONALD LEE PHILLIPS, )<br>)<br>Defendant. )<br>_____ ) | Case No. 3:03-cr-0078-JKS |

**HEARING BRIEF**

This matter was heard by the Court on December 19 and 20, 2005.  Prior to taking evidence, the Court stated that it "has to value the offset as of the time it passes into the hands of the V.A. and its agent, not at the time it's ultimately disposed of."  The Court further stated that it would "assume that the fair market value, in this context, means the same as fair market value in other contexts.  And that is what a reasonable buyer under no constraint to buy and a reasonable seller under no constraint to sell, would agree on at arm's length as the value of the property."  Tr. 1-2, 3.  The Court also noted

that it should be sensitive to the realities of forced sales and that property may have a higher market value than it would receive at forced sale, if you presume reasonable time to advertise property and investigate potential purchasers. Tr. 1-3. The Court also noted that the government bore the burden as to proof of fair market value. TR. 1-4.

The government presented three witnesses, the first of whom was Russell Vandersnick of Washington State. Mr. Vandersnick is the owner of Northwest Bus Sales, a family business which sells buses of varying types, including motor coaches. TR. 1-6. Mr. Vandersnick testifiied that Northwest Bus Sales entered into a contract with the Veterans Administration establishing strike prices for the buses which were relinquished to the authority of the Veterans Administration by Mr. Phillips on September 18, 2002 (Government Exhibit 1). Attachment A to that document lists the buses Northwest agreed to sell and the value given to each bus. Five buses were omitted from the strike list and two were never listed (Ford minivans). He testified that he had not seen the buses as of September 18, 2002. Tr. 1-9. He testified that he reached the so-called strike price based on average market values of buses in average condition and sellable. While Mr. Vandersnick did not personally inspect the buses prior to agreeing to take them, he did acknowledge that he had contact with Mr. Weatherington regarding the buses, was aware that Mr. Weatherington had seen the buses and purchased over half of them, and had worked closely with him over the years. So one may conclude that at time the original strike price was estimated, Mr. Vandersnick was relying upon Mr. Weatherington's expertise and particular knowledge with regard to these buses so

that the contemporaneous price estimate should be viewed by the Court as more reliable than an after-the-fact, last-minute, re-evaluation by Mr. Vandersnick and Mr. Weatherington on the day of the hearing, which may well have been influenced by the results of the bus sales that occurred after September 18 , 2003. Tr.1-13.

Mr. Vandersnick testified about various problems selling the buses and attempted to justify the low sales prices on the condition of the buses. It can also be argued that one reason Mr. Vandersnick did not do well selling the buses was that he did not actually use the proper sales mechanisms to realize a good price. He did not advertise them; he did nothing to prepare them for sale; and he simply was not in a position to devote the time and energy needed to attract a large enough buyers' pool to successfully move the buses. Since Mr. Phillips had no say in allowing Mr. Vandersnick and his company to sell his buses, Mr. Phillips cannot be penalized for these shortcomings. Given that Mr. Vandersnick had the benefit of Mr. Weatherington's 30 years of expertise, industry experience and advice, and Mr. Vandersnick agreed that Mr. Weatherington was an expert, his testimony after-the-fact about his difficulties in selling the buses should not be given much weight by this Court.

Mr. Vandersnick also placed zero value on buses with no titles. He testified they could not be sold and that there was no way to order a replacement title. Mr. Phillips and Mr. Belanger both testified that replacing lost titles is not difficult. Mr. Phillips should not be penalized for the decision to simply place a zero value on the buses especially since these are buses that Mr. Phillips had seen and driven in New

Jersey.. It appears that Mr. Vandersnick was too lazy to be bothered. Mr. Vandersnick also testified that the MC-5 buses were in poor condition and that they had a great deal of rust. However, at the time he prepared the strike list, Mr. Weatherington had seen those buses, in fact he had them on his lot, and never mentioned to Mr. Phillips that they were rusty. The buses which were transported to Alaska were in excellent condition. There is no reason to assume that these buses were not in good condition based on Mr. Phillips's conversations with NIMCO and the photographs of the buses which he saw..

Mr. Vandersnick did concede that it is possible that some bus parts might have been worth more than the actual bus, but since he is not a parts yard, he made no attempt to part out the buses, despite the fact that it might well have realized a greater price for the V.A. If this was something that Mr. Vandersnick's company could not do, he should have disclosed that information to the V.A. and given it an opportunity to part these buses out with another company so that the strike value and/or a reasonable amount of money could have been realized for them, rather than allowing Mr. Vandersnick to simply "give them away" for some future favor or consideration. This decision, of course, was not Mr. Phillips's to make, and some consideration should be given to the amount of restitution credit given him, based on the fact that Northwest Bus Sales did absolutely nothing to perverse or increase the value of the buses or the amount money it obtained for the V.A. Mr. Vandersnick did not market the buses, he did not look into leasing them, with one exception for which he received $1,000 a day, nor did he look into parting them out. Tr.1-51

Dan Weatherington also testified for the government. He stated that he had had over forty years in dealing with highway coaches, repairs and sales all over the country, and that he also did consulting work and advertising for some of the bigger bus companies. Tr. 1-67. He testified that he first met Mr. Phillips when Nick Liberti at NIMCO called him and said that he had a customer who wanted to buy four or five MC-5s and would need help transporting them to Seattle and then to Anchorage. Mr. Weatherington testified that he was trying to get a fair price for the buses so that "we wouldn't have to sit on things forever, but I knew they were going to take a lot of work when referring to the original strike prices," notwithstanding the $80,000 paid by Mr. Phillips and pocketed by Mr. Weatherington. He testified he did not recall any conversations about the condition of the buses with Mr. Phillips. Tr. 1-93. He did concede that he could have brought them up to a better value than the strike price if he had been willing to spend some money to refurbish and/or repair them. Tr. 1-94. He also testified that he understood that Mr. Phillips was willing to do that work, so that it was not a "ridiculous idea" to do so, and that the value to Mr. Phillips was the operation that he was planning in Alaska. Mr. Weatherington conceded that this was a reasonable and good use for these buses. Tr. 1-94. Mr. Weatherington also testified that the buses purchased from ABC by him for Mr. Phillips "were decent buses" and "could have been put into service". Tr. 1-198.

As to the buses damaged in transit which were subject to insurance claims, Mr. Weatherington did say that Mr. Bratton did talk to the insurance company and

decided that he did not want to "mess with it." Tr. 1-102. At the time that decision was made, Mr. Phillips was entirely out of the loop and should not be penalized because the Veterans Administration refused to pursue an insurance claim. Mr. Phillips should be given credit for the full value of those buses. Mr. Weatherington testified that, had the buses without titles had titles, they would have been worth the strike price that he placed upon them. Why then wouldn't the buses with titles have been worth the strike price?

      Mr. Weatherington knew the condition of these buses. He had seen them prior to the time that he entered into the contract with the Veterans Administration on which Mr. Phillips signed off and in which certain prices and values were assigned to these buses. Defendant contends that Mr. Vandersnick and Mr. Weatherington should be held to at least this value, given that without the benefit of hindsight and with Mr. Weatherington's knowledge of these buses, they believed contemporaneously that this was a fair price for the buses. The original strike price list omitted two buses, S14053 and S14004 which should be added to the value set out on the original strike price list at an improved value of $20,000 each plus $5,000 each for transportation paid to Mr. Weatherington for which he did not account. Tr.1-99.

      The only other witness for the government was Mr. Bratton, the Veterans Administration investigator who investigated this claim and made all of the decisions as to how and where the buses would be sold. Mr. Bratton believed that the strike price was "too high." Tr. 2-23. However, he conceded that he was not an expert, and from his testimony, it can be assumed that he believed that no one had seen the buses prior to the

time the strike price list was executed, which was untrue, as Mr. Weatherington had not only seen them, but inspected them and did some work on some of them and bought over one-half of them for himself. Mr. Bratton's sole purpose in testifying at this hearing appeared to be to remind the Court of Mr. Phillips's alleged criminal activity rather than to contribute anything useful to the determination of fair market value, which was the only purpose of this hearing.

Mr. Bratton did concede that once Mr. Phillips signed the document (Exhibit 1), he was out of it and that the negotiations were between Northwest Bus and the government. Obviously, the government had no interest after the fact in assigning a reasonable value to the buses for the purpose of determining restitution, as it had already received what little money it could from the sale, less the very high commission price negotiated by Northwest Bus. It was in the government's interest to apply as low a figure as possible to the credit for restitution, and its attempts to do so by applying sales proceeds less costs were not credible.

Mr. Phillips testified that he never had an option to retain the titles, that he could either surrender them, or that the prosecutor would initiate a forfeiture proceeding. He tried to be cooperative, so he did surrender the titles to the V.A., and in doing so relied upon Dan Weatherington's judgment. Tr. 2-28. He signed off on the strike price agreement and was under the impression that the government was going to credit restitution based upon the prices of the agreement and that both he and the government were relying upon Mr. Weatherington's expertise. Tr. 2-21. He had absolutely no input

into the Northwest Bus sales. Mr. Phillips testified as to how he came to be in the bus business and how he built that business up and, at some point in time, received a grant from the Veterans Administration based upon a five-year business plan to develop a transportation infrastructure that would provide city tours, day tours, transportation relocations between Anchorage, Denali, and Fairbanks, as well as airport to hotel shuttles. Tr. 2-32.

Mr. Phillips did travel to New Jersey, and inspected the three VanHool buses which he purchased so that he is qualified to testify as to their condition, which he classified as very good. Tr. 2-35. He testified that he relied upon Mr. Weatherington to arrange for transportation of these buses to Seattle. Unfortunately, the people Mr. Weatherington hired to transport the buses managed to seriously damage two of them. Tr. 2-35. He said that he repeatedly asked Mr. Weatherington to assist him with the insurance claims for these losses, but that once the bus titles were in the V.A.'s hands, he had no more ability to try to collect insurance damages.

As an alternative to the damaged VanHools, Mr. Phillips purchased buses from NIMCO, 14 MC-5s, for which he paid a total of $72,000. Tr. 2-38. He had multiple conversations with Nick at NIMCO; he reviewed photographs of the buses that he bought, as well as information on those buses; and he was told by Nick that the buses were drivable, complete and that all engines were running. Tr. 2-39. He believed that the buses had a great deal of value to him for parts recovery and that the drivable parts of each bus would have at least a $20,000 replacement value. Tr. 2-41. Mr. Phillips

testified that Mr. Weatherington assured him that the MC-5 buses were operational and could be driven. He was also assured that the interiors were all of the same high quality as the two in Alaska. As Mr. Weatherington did, in fact, ship two of the buses to Anchorage, and Mr. Phillips was personally able to inspect them, he had no reason not to rely on Mr. Weatherington's assessment of the condition of the buses. As he testified, the buses were no longer being manufactured, so that the bus parts took on additional value. Tr. 2-85. Mr. Belanger confirms that opinion.

Mr. Phillips testified about his relationship with Mr. Weatherington and the purchase of fifteen buses from ABC Bus Company for him by Mr. Weatherington. Mr. Phillips did not see those buses, but relied upon Mr. Weatherington's expertise and opinion that the buses were road-worthy and would pass DOT commercial use requirements. Based upon Mr. Weatherington's opinion, he transferred money to Mr. Weatherington who purchased buses for Mr. Phillips, as well as for himself.

Mr. Phillips testified that he believed that the buses were undervalued on the original strike price agreement (Tr. 2-91), and that he believed the value of the buses to be much greater in an Alaska market because there were not as many buses up here for sale. He also believed that the buses might have more value in a conversion market.

There was some testimony at hearing that the value of motor coaches fell after 9/11 because of a depression in tourism. However, in Alaska just the opposite happened, according to Mr. Belanger and Mr. Phillips, because people were changing their destinations to Alaska because it was a part of the United States and was an

insulated and safe vacation area, rather than leaving the country in uncertain times. Tr. 2-92. Mr. Phillips also testified that he actually paid Mr. Weatherington closer to $80,000 than the $30,000 that Mr. Weatherington admitted in his testimony (Tr. 2-102), rather than using that money to improve the buses in his possession, which of course would have improved the sale prices when they were ultimately sold by Northwest Bus Sales. Mr. Weatherington failed to account for that money. An additional $80,000 should be added to market prices of these buses, plus $86,000 for maintenance and repair, and $5,000 each for transportation to Alaska.

Defendant called Ray Belanger as his expert. Mr. Belanger submitted his résumé as Exhibit M and an expert report as Exhibit N. Mr. Belanger testified that he is the owner of Quality Equipment, and that since 1992 he has been a distributor of Thomasbilt buses in Alaska, and prior to that he worked for another company which purchased a variety of school and transit buses which were refurbished and brought to various places in Alaska, including Prudhoe Bay. Tr.2-48,49. He testified that today he probably sells 85% of all buses sold in Alaska. He also testified that he spoke with Michael Coangelo about the three VanHools which Mr. Coangelo sold to Mr. Phillips and was informed that they would pass state DOT inspection and safety inspections. He corroborated Mr. Phillips's understanding of the condition of the buses. Mr. Coangelo apparently tried to get $60,000 out of them but dropped his price down to $50,000, realistically expecting $45,000, but when Mr. Phillips showed up with cash, he figured that he would go ahead and take the $35,000. Tr.2 51, 52.

Mr. Belanger testified that he looked at bus values from different bus companies with regard to similar units, and that these were in the area of $20,000-$30,000 per bus. Based upon the information which he had from various sources, he believed that this was a fair price. If the $20,000 average value per bus is used, the fair market value of the buses on September 18 is $540,000 excluding any other considerations for transportation or enhancement monies.

Mr. Belanger also confirmed that the Alaska bus market was not adversely affected by 9/11, primarily because persons who might normally vacation outside the country preferred to stay in the United States. This increased the tourist trade to Alaska. Tr.2-52.

Mr. Belanger testified that he has sold buses in the Lower 48 for other dealers and that he believes that there is a way to market buses, *i.e.*, that he would first contact many of the bus dealers and see if he couldn't market them through a number of dealers, and that he would advertise the buses in a number of ways. He also testified that there is a uniqueness to all buses, regardless of their make, and when buses are no longer being built, the existing buses may become more valuable. He also testified that he would normally not expect a strike price to be made without a proper inspection of the buses, but that since Mr. Weatherington had seen the buses, he believed that he could have made an accurate strike price. Tr. 2-58. Mr. Belanger also testified that he had himself obtained title to buses to which there was no title accompanying the buses, and that he believed it could have easily been done. He further testified that he could not

imagine putting a zero value to a piece of equipment that had value to it for reason of the lack of a piece of paper. Tr. 2-60. Mr. Belanger and Mr. Weatherington both testified that the MC-5 buses are unique and ideal for the Alaska market. He said that a rebuilt engine for such a bus would cost a minimum of $10,000, and that a used engine is worth 50% of a new or rebuilt component. He said that if an engine is drivable, as these engines were, it is a $10,000 replacement and is worth $5,000. In addition to the engine, there are other component parts, such as windows and seats, tires and drive trains which may be used as replacement items and have value. Mr. Belanger stated that these buses were worth $10,200 per unit. We believe that Mr. Vandersnick's company did little, if anything, to obtain a good price for the buses, and that Mr. Phillips's buses represented a large fleet for him and his company to try and move, and that had dealers in various parts of the country had an opportunity to buy and/or sell these buses, there would have been better prices realized by Northwest. Mr. Belanger testified that marketing was actually there to sell the buses. He also testified that $30,000 was a fair price for each of the three VanHools. Tr. 2-70.

He explained that NIMCO was not strictly a salvage yard but also sold buses and that basically any salvage yard will sell a vehicle on its lot. Often salvage yards buy several vehicles and make one or more vehicles from them that are road-worthy, so that they actually do rebuild from bus components to complete rigs. NIMCO is also a refabricator of rail cars. Tr. 2-75. On cross-examination, Mr. Belanger explained that he sells vehicles to customers, either in Alaska or in places other than the

State of Washington, and that he is able to market those vehicles with photos and information on the internet and would also be able to fly clients back and forth to view the product.

Mr. Belanger evaluated the buses at $20,000-$30,000 per bus, utilizing all the information he had at hand, plus his own long-time experience in marketing, selling and refurbishing buses. He believes that this was a very conservative figure to put on the buses at the time the Court ordered the market value to be determined. He did state that the Prevo is the Cadillac of buses and in very high demand. Mr. Vandersnick did testify that it was a good bus, so he believed that it was worth at least $30,000.

Based upon the testimony the Court has before it, Mr. Phillips believes that the Court should accept Mr. Belanger's evaluation of the buses and should not find the testimony of Mr. Vandersnick, nor that of Mr. Weatherington, credible based upon their contradictions in testimony, past dealings with each other, and efforts to justify what was an admittedly low sale price by reevaluating the buses right before hearing for far less than the original strike price which Mr. Phillips maintains was at least untainted by their failure to properly market and sell his buses.

Mr. Phillips respectfully requests that this Court find that no restitution is owed to the government based upon either the original strike price plus the buses not on the list ($341,700) and monies not accounted for by Mr. Weatherington for transportation and refurbishment of buses for which he was paid by Mr. Phillips, including the two Ford

minibuses at $15,000 each, which he apparently kept, in the amount of $461,700, or in the alternative that this Court accept Mr. Belanger's evaluation of the buses.

DATED at Anchorage, Alaska this 21st day of February 2006.

HAGANS, AHEARN AND WEBB
Attorneys for Defendant

By: __/s/_____
Meredith A. Ahearn
Alaska Bar No. 6903001
HAGANS, AHEARN & WEBB
310 K Street, Suite 400
Anchorage, AK  99501
(907) 276-5294:  Phone
(907) 276-8732:  Fax
E-mail:  haw@alaska.net

CERTIFICATE OF SERVICE
I certify that a copy hereof was served
electronically this 21st day of February 2006,
on:

Retta-Rae Randall
U. S. Attorney's Office, District of Alaska
222 W. 7th Ave., #9, Room 253
Anchorage, AK 99513


_____/s/_____
Meredith A. Ahearn
Hagans, Ahearn & Webb