IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　Plaintiff,<br>　vs.<br>RONALD LEE PHILLIPS,<br>　　　　　Defendant. | Case No. 3:03-CR-00078-JKS<br><br>O R D E R |

### INTRODUCTION

Ronald Lee Phillips was charged with multiple counts of fraud against the United States in connection with funds he obtained from the government to repair and refurbish buses. The government contended that Phillips misrepresented his intentions and utilized the funds to purchase, rather than repair, buses—a use not permitted by the authorizing statutes. Phillips entered pleas of guilty to Count 1 (conspiracy to defraud the United States) and Count 2 (wire fraud). Counts 3–16 were dismissed at sentencing. Phillips received a sentence of 18 months imprisonment. In addition, he was directed to pay restitution. Docket No. 75. The loss to the United States was $450,375.57.[1] The sentencing hearing was held on November 13, 2003. Docket No. 71. Judgment was entered on December 23, 2003. Docket No. 68.

---

[1] Testimony at the evidentiary hearing established that Phillips received approximately $451,000 as proceeds of the fraud. The government's evidence established that Phillips paid $286,000 to purchase used buses and $78,000.00 for expenses, leaving $86,175.57 unaccounted. Docket No. 71 at 49.

1

An issue at sentencing concerned the offset Phillips was entitled to by virtue of his turning over the buses to the United States and its agents on September 18, 2002. The Court heard evidence and allowed an offset equal to $91,566.54, leaving a balance of $358,809.03.[2] Phillips appealed. The Ninth Circuit affirmed Phillips's conviction, and approved the amount of the government's loss at $450, 357.57, but held that this Court erred in two respects in determining the appropriate offset. First, in valuing the buses at their sale price a number of months after September 18, 2002 and second, in allowing the government to reduce the offset by expenses the government incurred in disposing of the buses. The case was remanded to allow calculation of the fair market value of the buses on September 18, 2002. Docket No. 81.

The hearing on remand took place over December 19 and 20, 2005. Docket Nos. 91, 92 (transcripts). At the completion of the evidence the parties agreed to simultaneously submit their final arguments in writing. Opening briefs were filed on February 21, 2006 and reply briefs on March 13, 2006. Docket Nos 100 (Government's opening brief); 103 (Phillips's opening brief); 107 (Government's reply brief); 108 (Phillips's reply brief). The case is now ripe for decision.

**DISCUSSION**

1. Burden of Proof

The governing statute places the burden of proving the amount of the victim's loss on the government by a preponderance of the evidence, but does not specifically address who has the burden of proving "offsets" available to reduce the loss.[3] Consequently, the Ninth Circuit reads the statute to allow the district court to place the burden of proving offsets "as justice requires." *See e.g., United States v. Crawford*, 169 F.3d 590, 593 n.2 (9th Cir. 1999) (citing 18 U.S.C. § 3664(e)). Typically, the Court would place the burden of persuasion on the party having the greater access to

---

[2] The transcript of the original evidentiary hearing at sentencing is found at Docket No. 71.

[3] For a definition of the phrase "preponderance of the evidence" see 9th Cir. Civ. Jury Instr. 1.13.

ORDER

F:\HOME\JUDGES\DOCS\SHARED\CR\D.AK 2003\A03-0078.005.wpd

the evidence.[4]  In most offset cases involving transfers from the defendant in the form of property to the victim, the defendant would be in the best position to prove the value of what he turned over.  But here, because Phillips surrendered the buses to the government and the government hired experts to dispose of the buses, the Court concluded that the ultimate burden of persuasion should be on the government as to the value of the buses at the time they were surrendered.

During the course of the hearing an issue arose as to certain buses that the government valued at zero.  These buses fell into two categories: 1) buses that were damaged while in the constructive possession of Phillips and his agents during transport from the East Coast to the State of Washington; and, 2) buses for which Phillips never obtained title.  Phillips argued that the government should have submitted insurance claims for the damaged buses and should have obtained titles for those buses with missing titles.  The government argued that Phillips should have submitted the insurance claims and obtained the titles either before he turned the buses over to the government or taken the steps necessary to enable the government to recover.  Since it is undisputed that Phillips was warned about these problems prior to turning the buses over to the Veteran's Administration, and did nothing, justice requires that he bear the burden of persuasion that government inaction caused these buses to lose value that should have been added to the available offset.[5]

   2. Fair Market Value

In the absence of any other suggestions by the parties, the Court assumes the offset will be measured by the fair market value of the buses on September 18, 2002.  Fair market value is the amount that a willing buyer under no compulsion to buy would pay and a willing seller under no

---

[4] It is possible to divide the burden of proof into three components: 1) the burden of pleading, *i.e.,* of raising an issue in the first place; 2) the burden of production, or going forward with the evidence; and, 3) the ultimate burden of persuasion.  Clearly, the defendant has the burden of raising the issue of offset in the first instance as well as the burden of going forward (to the extent of presenting evidence on the issue).  The difficult question is who should bear the ultimate burden of persuasion by a preponderance of the evidence.

[5] At sentencing, Phillips contended that he specifically offered to aid the government in making insurance claims and his offer was rejected.

ORDER

F:\HOME\JUDGES\DOCS\SHARED\CR\D.AK 2003\A03-0078.005.wpd

compulsion to sell would accept in an arm's length transaction after a reasonable time to allow the relevant market to be informed of the availability of the property for sale. Since the parties addressed the buses individually, the Court will value the buses individually and not attempt to determine what a single buyer would have paid a single seller for all of the buses on September 18, 2002.[6] Finally, significant testimony was given about expensive repairs that could have made the buses more market-worthy. This testimony has been considered but, given the uncertainties, has been given little weight. For the same reason, little weight has been given to testimony that the buses could have been "parted out" or converted to motor homes. The VA is not in the business of buying and selling buses and it is, therefore, not reasonable to expect that the government should expend significant additional funds speculating on possible increases in market value that those additional funds might have generated.

3. Date of Valuation

The date of valuation, as established by the Ninth Circuit, is September 18, 2002, the date Phillips transferred the buses to agents of the United States. Docket No. 81.

4. Expert Testimony

At the outset it is clear that there is no algorithm or formula into which certain facts may be fit in order to generate a fair market value for one or more of the buses. The parties have not produced any evidence of comparable sales. They appear to concede that there is nothing similar to the Kelley Blue Book or NADA guides as a reference for used bus prices. Given the specialized market, and the age and condition of these vehicles, any expert estimate regarding value is necessarily suspect. Nevertheless, the Court is satisfied that the three experts offered by the parties: Russell Vandersnick, Daniel Weatherington, and Arnold Belanger are all sufficiently familiar with buying and selling buses in Alaska and Washington to be of assistance to the Court and that the respective testimony of each of the witnesses meets the minimum standards established in *Kumho*

---

[6] The Court will assume that the buses should not be valued based upon one sale to one purchaser. On the other hand, the Court recognizes that while each of the parties' expert witnesses assume individual sales, each came up with a total figure which they believed represented the fair market value of all of the buses on the date of valuation.

ORDER

*Tire Company, Ltd. v. Carmichael*, 526 U.S. 137 (1999).  Compliance with *Kumho Tire* assures the admissibility and consideration of the expert testimony.  It does not, however, answer the question of what weight the testimony of each witness should receive; this is a matter of demeanor and credibility, which requires the Court to consider the totality of the evidence as well as the background, education, and experience of each witness and the reasons each witness gives for the opinion he expresses.  *See* 9th Cir. Civ. Jury Instr. 3.7.

    5.  Findings of Fact

At the original sentencing hearing, Phillips argued that the property should be valued on the date the property was turned over to the government and asked that the Court consider, for the purpose of determining a proper offset, a so-called "strike price" that he and the government's experts had arrived at on that date, which he calculated at $331,700.00.  *See* Docket No. 55, at 17 (Defendant's sentencing memorandum) *and* Exhibit Q to that memorandum.[7]  The Court concluded that the best evidence of the value of property is an arm's length sale of that property at a point in time near the date of valuation.  The Court, based on the evidence then in the record, concluded that the subsequent sale of the property was the best available evidence of its value.  Implicit in that determination was the conclusion that Phillips's actual purchase price of the buses, though arm's length, did not provide persuasive evidence of their value because the Court was convinced that Phillips paid too much.  Had the parties pressed the date of valuation issue, the Court would have

---

[7] The strike prices appear in a contract entered into by Northwest Bus Sales through its president Russell Vandersnick, Gregory Bratten, a special enforcement agent for the Veteran's Administration, and Ronald Phillips.  *See* Docket No. 55, Exhibit Q.  Dan Wetherington, who was advising Phillips at that time, also signed.  The strike price allowed: $80,000 for 11 1980 MCI MC-5C buses and one 1979 MCI MC-5C bus; $17,500 each for 4 MCI 96A2 buses; $27,000 for 1987 MCI 102A3; $31,000 for one 1989 MCI 102A3; $41,000 for one 1989 Vanhool T815; $20,000 for one 1989 Vanhool; $10,000 for one 1986 809 Vanhool; $24,800 for one 1986 MCI 102A3; and, $27,000 for one 1987 MCI 102A3.  The total of the strike prices is $331,700.00.  The contract provides that Northwest Bus Sales does not know for certain the whereabouts or conditions of above mentioned vehicles.  In an attached document, Phillips appointed Dan Wetherington his agent-in-fact to transfer ten buses to the VA.  Based upon the weight of the evidence, the Court concludes that Wetherington served as Phillips's agent and not as an agent for the VA in connection with the determination of strike prices.

ORDER

F:\HOME\JUDGES\DOCS\SHARED\CR\D.AK 2003\A03-0078.005.wpd

looked for evidence that showed that the value of the buses changed in some manner—either more or less valuable between the date of valuation and the date of sale.[8] Nevertheless, the extensive hearing on remand convinces the Court that the subsequent sale of the buses for approximately $91,000.00 did not represent their fair market value at that time and *a fortiori* at the earlier time when the buses first came into the government's possession. The Court accepts Phillips's argument that the availability of the buses could have been advertised more effectively, and if adequately marketed would have brought a greater return than the $91,000.00. *See* Docket No. 92, at 55-56 (testimony of Arnold Belanger). It is instructive that both of the government's experts valued the buses in excess of $91,000.00.

The Court remains convinced that Phillips overpaid for the buses when he acquired them and therefore does not view the price he paid as indicative of their value on September 18, 2002. In its original sentencing remarks the Court rejected the strike price as the fair market value of the buses as follows:

> . . . . [S]hould the contract between the parties and the stipulated strike price values govern? In other words, should the court read the contract as assuming that the buses that Mr. Phillips turned over were–had value of around $330,000. My conclusion is that that [is] not a proper reading of the contract. I think it is clear from the contract that the parties had not had the buses appraised, that the buses were scattered throughout the United States, some in Nevada, some in Washington. So I do not believe that the contract set a price that would be automatically credited against restitution. I think that a more reasonable interpretation of the contract is that the parties are going to try and get as much for the buses as they could. And I am impressed by the testimony that the buses as they existed, as is, where is, were not of the value stipulated in the contract but significantly less. So I think the figure $91, 566.64 reflects the Fair Market Value of the buses that were turned over and is an appropriate offset against the $450, 375.57 [*sic*].

Docket No. 71 at 115-16.

While the Court is no longer convinced that the eventual sale for $91,566.64 reflects the fair market value of the buses on the date of valuation, nothing at the subsequent evidentiary hearing after remand leads the Court to change its view that the strike prices were not intended by the

---

[8] At the remand hearing, Arnold Belanger testified that buses depreciate rapidly during their first five years of life; thereafter, their value is a function of their condition because condition determines the income their use can generate. Docket No. 92, at 76-78. The Court credits this testimony. All of the buses under consideration were more than five years old and unlikely to depreciate further in any automatic sense.

ORDER

F:\HOME\JUDGES\DOCS\SHARED\CR\D.AK 2003\A03-0078.005.wpd

parties as an automatic offset to the restitution that Phillips would owe. Or, that viewed independently, the strike prices reflect the fair market value on the date of valuation. The evidence at the hearing on remand reinforces the Court's earlier conclusion that, given the age of the buses, their value is primarily a function of their condition and, that on the date of contracting, the parties did not fully know the buses's conditions.[9] Consequently, the strike prices were based upon a joint estimate by Vandersnick and Wetherington of what average buses of the vintage of the subject buses would bring. The Court is also of the view that the testimony at the hearing on remand established that the Phillips buses were not of fair average quality and that to the extent that they were not, the strike prices did not accurately reflect their fair market value.

Arnold Belanger testified as an expert for Phillips. Belanger had not seen the buses and declined to give an estimate of the fair market value of the entire fleet. He had looked at photographs that represented one bus, which he considered to be in good shape and readily marketable and ventured the opinion that if all of the buses were in that condition they should have been able to meet the strike prices. It appears that the photograph he relied upon was not in fact one of the buses which Phillips transferred to the VA. Further, the Court has had an opportunity to determine the credibility of Phillips and does not consider his testimony reliable. To the extent that Belanger relied upon Phillips for information regarding the condition of the buses, his testimony would suffer accordingly. Finally, Belanger considered the estimates of Wetherington and Vandersnick too low, in part, because they gave no value to buses without titles. The Court has

---

[9] Dan Wetherington and Phillips probably had the best knowledge regarding the condition of the buses at the time of contracting, but even their knowledge was incomplete. The important question is did the parties, *i.e.,* the VA and Phillips, reach a meeting of the minds that the strike prices would determine the offset to which Phillips was entitled. The Court is convinced that the answer to that question is no, and that the question of the appropriate offset was intended to be deferred until the buses could be assembled and sold. Wetherington testified that he was aware of the condition of the buses but viewed the strike prices as what the buses would be valued at if "sale worthy," which they were not at that time. *See* Docket No. 91, at 74-75, 111-112. In retrospect, Wetherington testified that it would have taken $200,000 additional investment to make the buses saleworthy. *Id.* at 112.

ORDER

F:\HOME\JUDGES\DOCS\SHARED\CR\D.AK 2003\A03-0078.005.wpd

considered the testimony of Belanger but has discounted it because he never inspected the buses and therefore his assumptions regarding the value of individual buses is suspect.

Russ Vandersnick testified on behalf of the government. Docket No. 91 at 5, et seq. He testified that the buses in question were over-the-road motorcoaches, which involved an entirely different market than the market for transit buses and school buses. The Court accepts this testimony. Vandersnick had not seen any of the buses at the time he signed the agreement with the VA that established the strike prices. Plaintiff's Exhibit 2 from the remand hearing is a copy of Exhibit 1 with the strike prices removed and new estimates substituted by Vandersnick. In addition, Vandersnick added and valued additional buses not appearing on the original Exhibit 1. He arrived at a total value for the buses of $173,000.00, which the government views as improperly added up. In its Memorandum the government adjusts this figure to $178,000.00, which the Court will use as Vandersnick's estimate of fair market value. *See* Docket No. 100, at 9 (government's brief).

Dan Wetherington was the government's second expert. He estimated the fair market value of the total fleet at $203,000. (The earlier figure of $189,500 was apparently a clerical addition error.) Docket No. 100 at 9 (government's brief).[10]

## CONCLUSION

The Court has considered the evidence offered by the parties and their respective arguments regarding the two vehicles damaged in transit and the three vehicles for which there were no titles. The Court has determined that Phillips, rather than the VA, was responsible for failing to make insurance claims and obtain the necessary titles. Consequently, the Court will not reduce Phillips's restitution to reflect what might have happened if Phillips had pursued the insurance claims or sought titles. The Court is convinced that the VA could not have increased the offset without more cooperation from Phillips than was in fact forthcoming.

---

[10] Phillips argues that Wetherington received two Ford minivans from him, as well as additional payments, to make the buses saleable. The Court does not conclude that any amounts Wetherington might owe Phillips should be deducted from restitution; those amounts are not the responsibility of the VA.

ORDER

F:\HOME\JUDGES\DOCS\SHARED\CR\D.AK 8003\A03-0078.005.wpd

After carefully considering all of the testimony, the Court concludes that the true fair market value of the total fleet on September 18, 2002, was somewhere between the Vandersnick and Wetherington estimates for the reasons given in their respective testimony. The Government's position, at **Docket No. 100**, is **GRANTED**. The Court will, therefore, allow Phillips an offset of $203,000.00, which will reduce his restitution obligation from $450,375.57 to $247,275.57. The Clerk shall enter an amended judgment reflecting this amount as the amount owed for restitution.

**IT IS SO ORDERED**.

Dated at Anchorage, Alaska, this 1st day of June 2006.

/s/ James K. Singleton, Jr.
**JAMES K. SINGLETON, JR.**
United States District Judge

ORDER

F:\HOME\JUDGES\DOCS\SHARED\CR\D.AK 2003\A03-0078.005.wpd